615 A.2d 951

**WEST PENN POWER COMPANY, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**ARMCO ADVANCED MATERIALS CORPORATION and Allegheny Ludlum Corporation, Petitioners,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 17, 1992.

Decided Sept. 3, 1992.

Reargument Denied Nov. 10, 1992.

352

354

Drew Kovalak, for petitioner, West Penn Power Co.

Michael L. Kurtz, for petitioners, Armco Advanced Materials Corp. and Allegheny Ludlum Corp.

Lee E. Morrison, for respondent.

Clifford B. Levine, for intervenor, Mon Valley Energy Corp.

Before CRAIG, President Judge, and DOYLE, McGINLEY, SMITH, PELLEGRINI, FRIEDMAN and KELLEY, JJ.

CRAIG, President Judge.

In this consolidated case, West Penn Power Company, Armco Advanced Materials Corporation, and Allegheny Ludlum Corporation [1] appeal a decision of the Pennsylvania Public Utility Commission. Mon Valley Energy Corporation has intervened in support of the commission's decision.

### History

In October 1987, Mon Valley entered into an electric energy purchase agreement (EEPA) with West Penn for energy to be produced at the Shannopin Mine Project, a proposed qualifying cogeneration facility (QF) under section 201 of the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. § 796. Mon Valley is the developer of that QF.

---

1. The appellants Armco Advanced Materials and Allegheny Ludlum will be referred to as Armco/Allegheny throughout this opinion.

The project is designed to be a 80 megawatt (MW) coal-fired cogeneration facility that will simultaneously produce electric power to be sold to West Penn and steam to be sold to the Shannopin Mining Company for use in its coal drying facility.

In January 1988, West Penn submitted the EEPA to the commission for approval. Armco/Allegheny, two large industrial customers of West Penn, intervened in the approval proceeding to contest rates contained in the EEPA. The commission entered a Tentative Opinion and Order on July 8, 1988, granting West Penn's approval petition, without first holding a hearing on the matter.

On August 22, 1988, this court issued its decision in *Barasch v. Pennsylvania Public Utility Commission,* 119 Pa.Commonwealth Ct. 81, 546 A.2d 1296, *reargument denied,* 119 Pa.Commonwealth Ct. 81, 550 A.2d 257 (1988) (*Milesburg I* ). That case involved the commission's approval of an EEPA between West Penn and another QF, Milesburg Energy, Inc. The court held that, before the commission may approve the legality of a contract for a utility's purchase of power from a QF that includes substantial payments for capacity, due process requires that the utility's customers must be provided with notice of the proceedings and an opportunity to be heard to challenge the proposed action, because such approval by the commission is adjudicatory in nature and involves substantial property rights of ratepayers.

Thereafter, the commission withdrew its Tentative Opinion and Order granting the approval petition for the Shannopin Project and, on September 30, 1988, consolidated the Shannopin Project proceedings for hearing purposes with three other pending petitions for approval of contracts between West Penn and QFs. Following remand of the record after the court's disposition of the commission's petition for reargument in *Milesburg I,* the commission consolidated that case for hearing with the other three and assigned the case to the Office of Administrative Law Judges for hearing and recom-

mended decision.[2]

An administrative law judge (ALJ) conducted a hearing on the consolidated cases over eight days in April of 1989. He bifurcated the hearing into Phase One, relating to a determination of the proper capacity rates to be paid to the QF's, and Phase Two, relating to issues arising from litigation delays.

In the Phase One proceeding involving the Shannopin Project, the ALJ issued a recommended decision holding that the time of "agreement in principle on price" employed by West Penn in regard to the QF contract satisfied the commission's standard of time of "serious negotiations" as the time as of which full avoided costs[3] should be determined. He also approved the time-of-serious-negotiations standard itself. Armco/Allegheny had argued that the date when the utility and the QF execute an EEPA is the proper date to use to calculate a utility's avoided costs, because that is the date when a QF becomes legally committed to deliver power. The commission essentially adopted the ALJ's Phase One recommended decision.

West Penn appealed that decision to this court, which reversed the commission, concluding that the date when a QF becomes legally obligated to a utility, rather than the date of serious negotiations, is the date to use to determine the avoided costs for the purpose of establishing capacity rates in an EEPA. *Armco Advanced Materials Corporation v. Pennsylvania Public Utility Commission,* 135 Pa.Cmwlth. 15, 579 A.2d 1337 (1990) *(Shannopin I ).*

Mon Valley was not involved in the Phase Two proceedings in April 1989, when the ALJ bifurcated the proceedings,

2. In the course of denying the commission's petition for reargument in *Milesburg I,* this court held that because the case presented questions of first impression, the resolution of which could not have been clearly foreshadowed, the decision would have only prospective effect. Therefore, the commission was not required to provide notice and a hearing in the cases consolidated with the *Milesburg* case, including that relating to the Shannopin Project, but the commission elected to do so.

3. Avoided costs essentially represent the money a utility would otherwise spend if it had to construct a facility to produce needed energy it purchases from a QF.

because the commencement date for its project and the related milestone dates were later than those dates for the other projects in the consolidated proceedings.

In the Phase Two proceedings, the commission held that it was obligated to ensure that litigation delays did not result in the termination of two of the other projects, Burgettstown and Milesburg.

With regard to Milesburg, the commission ordered that West Penn enter a new EEPA with Milesburg, because the original EEPA had expired by its own terms. The new EEPA contained terms identical to the terms of the original, but with new milestone dates that would reflect the date of a final non-appealable order terminating the proceedings.

In the case of the Burgettstown EEPA, the original EEPA had not expired, because the commission had granted the QF's motion to stay the original financing closing date in the EEPA. The commission ordered that the Burgettstown EEPA be modified to extend the financing closing date and related milestone dates in the original EEPA to reflect the litigation delays.

On April 20, 1990, before this court decided the Phase One issues in Shannopin I, Mon Valley filed its petition for modification of the EEPA, a motion for stay of the good faith deposit requirement of the EEPA, and alternatively, a motion to enjoin West Penn from implementing Section 6.2 of the EEPA. Under the terms of the EEPA, the agreement would expire if Mon Valley did not make the good faith deposit of $120,000 on May 1, 1990.

On April 27, 1990, Commissioner William H. Smith issued an Emergency Order granting the stay of the the the May 1, 1990 good faith deposit requirement. On May 10, 1990, the commission ratified the stay of the good faith deposit requirement. The stay prevented the automatic termination of the EEPA pending the outcome of proceedings regarding the modification petition.

In a pre-hearing order, the ALJ indicated that all rate issues fell within the scope of the Phase One proceedings and

were beyond his jurisdiction and that the scope of the Phase Two hearing would be limited solely to the reasonableness of the modifications Mon Valley was requesting. As indicated above, the sole issue in the *Shannopin I* case involved the question of whether the date of serious negotiations or the date a QF becomes legally obligated to deliver capacity or energy is the date upon which to determine avoided costs.

Based on the narrow scope of the petition and hearing, the ALJ struck pre-filed direct testimony submitted by West Penn in which the witnesses testified regarding West Penn's avoided costs. The testimony suggested that those costs had become zero and that, therefore, if West Penn were forced to continue with its agreement with Mon Valley, the result would be excessive costs to its ratepayers.

The ALJ recommended that the commission grant Mon Valley its requested modifications. The commission accepted the ALJ's recommendations.

*Issues*

In this appeal, West Penn and Armco/Allegheny raise the following issues: (1) whether the commission has jurisdiction to modify the terms of the EEPA while an appeal from the commission's approval of the original contract is pending before this court; (2) whether the commission erred by entering interlocutory emergency and stay orders which granted Mon Valley relief from its contractual commitments to West Penn under the terms of the EEPA; (3) whether the commission has authority to modify an EEPA; (4) whether the commission's granting of new terms of the EEPA creates a new contract which requires a new determination of avoided cost under 18 C.F.R. § 292.304(d) as of the date of the allegedly new legally enforceable obligation; (5) whether the commission's contract modifications are improper because they are not just and reasonable to West Penn's customers or in the public interest as required by PURPA; and (6) whether the commission erred in striking the testimony of two of West Penn's witnesses regarding avoided costs, which testimony West Penn purportedly offered to help determine whether

Mon Valley's requested modifications to the EEPA satisfied PURPA's requirement that rates contained in EEPAs be just and reasonable and in the public interest.

*1. Does the commission have jurisdiction over a petition to modify the terms of an EEPA during a period when an appeal from the commission's approval of the original EEPA is pending before this court?*

■ Both West Penn and Armco/Allegheny argue that the commission was without jurisdiction to modify the terms of the EEPA.

. Armco/Allegheny relies upon Pennsylvania Rule of Appellate Procedure 1701(a), which provides

**General rule.** Except as otherwise prescribed by these rules, after an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may no longer proceed further in the matter.

Armco/Allegheny points out that subsection (b) of that rule provides for six exceptions to the rule—situations in which an administrative body may act even after a matter has been appealed:

1) actions necessary to preserve the status quo, correct formal errors, cause the record to be transcribed, or take other actions ancillary to the petition for review proceeding;

2) actions to enforce any order entered in the matter;

3) grants of reconsideration;

4) authorizations for depositions and preserving testimony;

5) actions authorized or directed by Commonwealth Court;

6) continue proceedings if a nonappealable interlocutory order has been entered.

Armco/Allegheny has addressed exception 1, which allows a tribunal to take actions to preserve the status quo and to take other actions that are ancillary to the matter being appealed.

As Armco/Allegheny notes, status quo has been defined as "the last actual, peaceable and lawful, non-contested status which preceded the controversy." *Miceli v. Unemployment*

*Compensation Board of Review,* 519 Pa. 515, 521, 549 A.2d 113, 116 (1988).

Armco/Allegheny asserts that, under that definition, the status quo in this case was the relationship between West Penn and Mon Valley under the terms of the original EEPA, and that the commission's grant of the modifications changed that status quo.

Armco/Allegheny also addresses an exception in Pa.R.A.P. 1701(c), which the Supreme Court has stated is intended to "prevent appeals of collateral issues from delaying the resolution of the basic issues where the proceeding below can continue without prejudicing the rights of the party seeking the interim review." *Rosen v. Rosen,* 520 Pa. 19, 24, 549 A.2d 561, 564 (1988). Armco/Allegheny asserts that the present case does not fall within the ambit of this rule because, it argues, the resolution of the entire case at the commission level was completed when the commission issued its final order in September 1989 approving the EEPA and because, when that decision was appealed, there were no remaining issues for the commission to decide.

In response to the above arguments, Mon Valley and the commission contend that the commission's granting of the modifications preserved the status quo of the contractual relationship.

Mon Valley argues that the commission's determination of the modification petition was critical to preserve the contractual relationship pending the outcome of the Phase One appeal and to reflect the impact of that appeal on the contract.

In the Phase One appeal, the only aspect of the capacity rate that was challenged was the date to be used for determining the capacity rate because at the time Mon Valley became legally obligated to West Penn, conditions relevant to the rate determination, the federal and state corporate income tax rates were lower than at the time of serious negotiations.

The commission's order in the Phase Two proceeding does not affect that aspect of the Phase One determination, the Phase One appeal, or this court's remand in the Phase One

appeal. In *Shannopin I*, this court only directed the commission to adjust the rates to reflect the date Mon Valley became legally obligated to West Penn. In that case, as discussed above, the significance of the change in date resulted in lower capacity rates only because the corporate tax rate as of that date was lower than on the date of serious negotiations.

In this Phase Two proceeding, the method of calculating the rate has not been challenged. Furthermore, as discussed below, West Penn's avoided costs have not changed.

As the ALJ noted

West Penn's avoided costs are not at issue in this proceeding. As the court noted in *Milesburg II*, however, it is both consistent and equitable to adjust Mon Valley's capacity rate to reflect the later in-service date.

■ Quoting the *Milesburg II* decision, the ALJ recognized that West Penn's avoided costs will not change with a change in Shannopin's in-service date. A change in that date will result in a change in the capacity credit; however, West Penn's avoided costs remain constant. In accordance with PURPA, rates are reasonable as long as they are at or below the full avoided costs of the utility. *American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 418, 103 S.Ct. 1921, 1930, 76 L.Ed.2d 22 (1983).

The commission, relying on this court's rulings in *Milesburg*, recognized the dynamic nature of these proceedings, and PURPA's mandate of furthering reliance on national resources, and took appropriate action to ensure that West Penn and Mon Valley's contractual relationship remained alive while the Phase One aspect of the case was in the appeal stage. If the commission had not acted on the modification petition, PURPA's goals would be undermined.

■ Armco/Allegheny further asserts that subsection (d) of Pa.R.A.P. 1701 does not give the commission jurisdiction pending appeal. That rule provides

The filing of a petition for review (except a petition relating to a quasijudicial order) shall not affect the power or authority of the government unit to proceed further in the

matter, but the government unit shall be subject to any orders entered by the appellate court or by a judge thereof pursuant to this chapter.

Although Armco/Allegheny is correct in asserting that the commission's order constitutes a quasijudicial order, our conclusion that the commission's order maintains the status quo places the action within exception (b)(1) of Pa.R.A.P. 1701 and hence renders subsection (d) inapplicable.

*2. Did the commission have the authority or jurisdiction to issue the emergency and stay orders?*

■ West Penn argues that the commission lacked jurisdiction to issue the emergency and stay orders which prevented the automatic termination of the original EEPA. West Penn argues that, if the commission had no authority to issue those orders, then the EEPA automatically terminated when Mon Valley did not meet the good faith deposit deadline.

West Penn presents essentially the same jurisdictional arguments that Armco/Allegheny presented in section 1 of this opinion—that the commission lacked jurisdiction to issue the emergency and stay orders because the commission's approval of the original EEPA was the subject of an appeal to this court at the time Mon Valley filed its modification petition. Thus, West Penn asserts that only this court had jurisdiction over the EEPA at that juncture.

Mon Valley and the commission assert that the emergency and stay orders that prevented termination of the original EEPA during the appeal period maintained the status quo of the contractual relationship between the parties rather than extinguish it. As Mon Valley notes, the commission's emergency and stay orders preserved the relationship and did not alter the contractual obligations.

For the reasons stated above in our discussion of Armco/Allegheny's argument regarding the commission's jurisdiction over the petition for modification, this court concludes that the appeal of the commission's decision relating to the Phase One

aspects of this case did not divest the commission of jurisdiction to issue the emergency and stay orders.

■ Both West Penn and Armco/Allegheny also argue that the commission did not have authority to issue the stay and emergency orders. With regard to emergency orders, the commission's regulation at 52 Pa.Code § 3.7(a) provides that

A presiding officer may issue an interim emergency order upon finding that the following exist:

(1) The petitioner's right to relief is clear.

(2) The need for relief is immediate.

(3) The injury would be irreparable if relief is not granted.

(4) The relief requested is not injurious to the public interest.

As discussed below in this opinion, this court believes that Mon Valley's right to relief was clear. With regard to the second criterion, need for immediate relief, as Mon Valley points out, if the commission had not issued the order, Mon Valley could have lost its good faith deposits of $120,000 in May and October of 1990.

■ West Penn argues that monetary loss is not a sufficient reason to issue an emergency order. As Mon Valley and the commission point out, although monetary losses generally are insufficient to support an emergency order, such losses can satisfy the rule's irreparable injury requirement. In this case, if the commission had not issued the order, Mon Valley might have sustained losses, due to no fault of its own, that it would not be able to recover later under any cause of action.

Armco/Allegheny argues in its reply brief that the alleged potential loss is purely speculative because West Penn could return the money to Mon Valley, or the money could be offset in whole or part by a limitation of liability provision in the EEPA. However, in a footnote, Armco/Allegheny also recognizes that the commission could order that the funds be used as an offset to revenue requirements for the benefit of ratepayers in a rate case. Hence, there was a great deal of uncertainty as to whether or not Mon Valley could recover its

good faith deposits. Accordingly, this court concludes that the irreparable harm criterion was satisfied.

Finally, the relief the commission granted in the order is not injurious to the public interest.

■ Both West Penn and Armco/Allegheny argue that no emergency existed which would justify the granting of an emergency order. The commissioner who issued the interim emergency order concluded that an emergency existed, based on his finding that there was a clear and present danger to Mon Valley's property interest in the good faith deposits it had paid at the time it requested the stay, and in the deposits it would have had to pay without the grant of the stay.

In *Peoples Natural Gas v. Public Utility Commission*, 124 Pa.Commonwealth Ct. 59, 555 A.2d 288, 291 (1989), this court, referring to our decision in *Brink's, Inc. v. Pennsylvania Public Utility Commission*, 76 Pa.Commonwealth Ct. 496, 464 A.2d 639 (1983), stated that "[Brinks] held that a finding that economic detriment would result if the temporary grant were not issued did not amount to an "emergency" as a matter of law." However, a review of the *Brinks* case reveals that the court only stated that

Without ruling on the issue of whether the potential for economic detriment can rise to the level of an "emergency" ... we observe that *due to the ALJ's failure to conduct an evidentiary hearing, there is no evidence of record to support the ALJ's finding [that an emergency existed]*.

76 Pa.Commonwealth Ct. at 502, 464 A.2d at 641.

Thus, the court in *Brink's* did not hold that economic detriment can never support a finding that an emergency exists. Furthermore, the facts in the *Peoples* decision, upon which West Penn relies, is factually distinguishable. In that case, the economic detriment alleged was "an economic threat of the loss of a proposed plant *expansion*." 124 Pa.Commonwealth Ct. at 65, 555 A.2d at 291 (emphasis in original). This court concludes that the facts in this case supported a finding of an emergency, and that Commissioner Smith properly

issued the order and that the commission was correct in affirming the order.

### 3. Does the commission have the power to modify EEPAs?

■ In *Armco Advanced Materials Corporation v. Public Utility Commission*, 135 Pa.Commonwealth Ct. 15, 579 A.2d 1337 (1990) (*Milesburg II* ), this court held that (1) the commission exceeded the authority granted to it under PURPA by calculating the utility's avoided costs (resulting from purchasing energy from a QF) by using a date earlier than the date upon which a legally enforceable obligation was created between the QF and West Penn and (2) the commission had the authority to order a utility to enter a new EEPA after the first contract automatically terminated on the expiration of the contract deadline.

In *Armco Advanced Materials Corporation v. Public Utility Commission*, (No. 2090 and 2097 C.D.1989, filed September 7, 1990) (*Burgettstown* ) [4], this court affirmed the commission's approval of contract modifications that extended the financing closing date of an EEPA and other milestone dates in the EEPA.

West Penn suggests that this court reconsider its decisions in *Milesburg II* and *Burgettstown*. West Penn argues that, by accepting Mon Valley's petition, the commission has, and this court would be affirming, the evisceration of the Federal Energy Regulatory Commission's (FERC) regulations, specifically, 18 C.F.R. § 292.301(b). That regulation provides for two means by which the goal of requiring utilities to purchase energy from cogeneration facilities may be accomplished. The first method involves voluntary negotiations between a QF and a utility, and the second method involves a QF's filing of a petition with a state utility commission to compel a utility to purchase energy from the QF.

4. *Burgettstown* is an unreported decision of this court; hence under our internal operating rules parties generally are not permitted to cite such cases or rely upon them in arguments. However, Mon Valley filed a petition with this court for permission to cite *Burgettstown*, which the court granted.

Specifically, West Penn, citing two decisions from other states, argues that this court should reconsider our *Milesburg II* decision because, otherwise, PURPA's provisions exempting negotiated contracts from PURPA rules must be regarded as meaningless.

In one of the decisions West Penn relies upon, *In re Vicon Recovery Systems*, 153 Vt. 539, 572 A.2d 1355 (1990), the utility and QF entered into an EEPA which included rates and terms that they agreed to submit to the state utility board for approval. The parties jointly submitted the agreement to the board, which denied the motion, and in a later request for reconsideration, the board specifically disapproved the rate requested and substituted the original EEPA's term of twenty-six years with a thirty-year term.

On appeal to the Vermont Supreme Court, the appellants argued that federal law preempted state regulation of EEPAs and thus precluded the board from exercising jurisdiction over rates contained in EEPAs, and Vermont's equivalent of Pennsylvania's Office of Consumer Advocate argued that the state board did not have authority under Vermont law to reject the rate in the EEPA.

In that case, the Vermont Supreme Court concluded that 18 C.F.R. § 292.304 applies only in situations in which a utility is forced to purchase power from a QF.

This court, however, agrees with Mon Valley that the facts in *Vicon* distinguish it from the present case. Specifically, as Mon Valley notes, Vermont does not require the state board to conduct an evidentiary hearing to determine whether rates proposed in an EEPA exceed avoided costs.

West Penn also relies upon a decision from the Supreme Court of Texas, *Public Utility Commission of Texas v. Gulf States Utilities Co.*, 809 S.W.2d 201 (Tex.1991). However, that decision appears to stand only for the proposition that state utility commissions cannot modify the terms of privately negotiated contracts. There is no indication in that opinion that the parties considered the distinction between a privately negotiated contract that the parties elect not to submit to a state utility commission and privately negotiated contracts

submitted for approval, as this court recognized in *Milesburg II.*

Furthermore, as Mon Valley notes, in the *Gulf States* decision, the court noted that the applicable law in Texas permits utilities to pass-through rates that are in excess of avoided costs.

As Mon Valley points out, if the commission were to allow utilities to pass through rates in an EEPA, including rates that are in excess of avoided costs, then requiring hearings to enable ratepayers such as Armco/Allegheny to challenge the rates would have no purpose.

■ West Penn argues that it submitted the EEPA to the commission to obtain approval of pass-through of the avoided cost rates and that in order to collect those rates from its customers, it was *required* to obtain commission approval. However, in the case of a truly privately negotiated contract, the utility could seek recovery in a rate proceeding, rather than seek approval of EEPA rates.

■ As this court recognized in *Milesburg II,*
A utility's submission of its contract with a QF to the PUC for approval is legally equivalent to a petition by the QF to the PUC to compel the utility to enter into that contract ... The situation is not significantly different from one where a QF simply petitions the PUC to compel a utility to purchase. 579 A.2d at 1348–49.

■ This court noted that there is a basic distinction between a completely privately negotiated contract and one the utility submits to the commission for approval. In the former case, where the terms of the EEPA are not subjected to the commission's scrutiny, the utility bears the risk that the commission, in a later rate proceeding, will not approve the utility's request for an increase in rates.

4. *Did modification of the EEPA create a new date of a legally enforceable obligation, thus requiring a new determination of avoided costs?*

■ West Penn and Armco/Allegheny also argue that, if the commission's modifications are valid, so that the contract

did not automatically terminate upon the expiration of the original milestone dates, then a new determination of avoided costs is necessary, because the determinative date of a legally enforceable obligation under the original contract is no longer applicable.

Armco/Allegheny asserts that, if the commission's modifications are upheld, then the court's order, but not its rationale, will be rendered moot because the October 15, 1987 contract and the legally enforceable obligation would no longer exist, i.e., the obligation to deliver power to West Penn under the original contract would be gone. Therefore, Armco/Allegheny argues, under 18 C.F.R. § 292.304(d), it would be improper to recalculate West Penn's avoided costs at the time of the original date the parties signed the contract. Armco/Allegheny contends that the more up-to-date the avoided cost inputs are, the lower the avoided cost rate and charge to ratepayers will be.

Specifically, Armco/Allegheny argues that the use of the original EEPA capacity rate will result in more than $500 million in payments in excess of current avoided cost. Armco/Allegheny relies on the testimony of a West Penn witness which indicates that West Penn does not need Shannopin's capacity "At this particular time" and that therefore, granting the extensions is not in the public interest, a specific requirement of section 210 of PURPA.

According to West Penn's brief, its "current capacity plans call for the construction of low capital cost combustion turbine peaking units in 1999–2000," rather than "the expensive base load capacity sought to be constructed by Mon Valley/CMS Generation." (Brief at 44.) This argument appears to be disingenuous based on West Penn's conduct and the contract it entered with Mon Valley for Shannopin's capacity when it first sought commission approval of the original EEPA.

As Mon Valley points out, the determination of avoided costs in these proceedings was based upon West Penn's need for a 900 MW coal-fired facility comprised of three units that were to come on-line in 1995, 1997 and 1998. *See Shannopin I.*

Mon Valley points to this court's decisions in *Milesburg II,* in which the court held that, where an original EEPA had expired, the legally enforceable obligation existed on the date the original EEPA was signed for the purposes of the modified EEPA the PUC and the court approved, and *Burgettstown,* in which the court directed the commission to calculate Burgettstown's capacity credit based on inputs that were applicable at the time the QF and the utility executed the EEPA.

Indeed, in the *Milesburg* line of cases, the original EEPA forms the basis for the continued obligation on the part of the utility to acquire energy from the QF. As noted in our discussion below, the changes in the EEPA comply with PURPA's requirements and do not represent significant alterations of the original contract terms.

 Nevertheless, West Penn, in its reply brief, asserts that this court should not rely on those decisions, arguing that they are distinguishable from the present case, because the Phase One and Phase Two issues in *Milesburg* and *Burgettstown* were reviewed at the same time, whereas, in this case, Mon Valley did not seek modifications until after the conclusion of the Phase One proceedings.

Although West Penn recognizes that at the time of the Phase One proceedings, Mon Valley's significant milestone dates were not as imminent as in the other cases, West Penn argues that Mon Valley should have and could have anticipated that compliance with those dates would be difficult, and therefore, Mon Valley should have requested modifications at the time of the Phase One proceeding.

However, as discussed above, the commission had jurisdiction over this phase of the litigation, and Mon Valley's delay in requesting modifications was not unreasonable.

5. *Do the modifications of the EEPA comply with PURPA's requirements that terms of EEPAs be just and reasonable and in the public interest?*

 Armco/Allegheny argues that the modifications are significant. The commission asserts that the modifications of

the EEPA are minor and that the extension of the in-service date for the Shannopin project places the date closer to the time West Penn needs the capacity.

With regard to the specific changes in milestone dates, Mon Valley points out that litigation delays forced the change in the financing closing date. Because the other milestone dates in the EEPA are based upon the financing closing date, the commission properly altered those dates to reflect the new financing closing date.

■ West Penn and Armco/Allegheny object to the extension of the date used as the basis for the capacity rate. The ALJ, relying on this court's decision in *Milesburg II,* as noted above, recognized that West Penn's avoided costs do not change with the extension of the milestone dates. PURPA requires that capacity rates be at or below avoided cost. The later in-service date does change the capacity rate the QF will receive from the utility; however the rate remains consistent with West Penn's avoided costs. Mon Valley correctly states that the United States Supreme Court has upheld FERC decisions that rates which reflect avoided costs are *per se* just and reasonable and in the public interest. *American Paper Institute, Inc. v. American Electric Power Service Corp.,* 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983).

■ Armco/Allegheny contends that the change in financing by increasing the financing term allowed in the contract will result in a substantial increase in ratepayer risk. Armco/Allegheny states that the levelized capacity rate contained in the original contract was based upon the assumption that Shannopin will sell capacity to West Penn over the entire thirty year term of the contract, and if Shannopin is unable to deliver capacity over that period, West Penn's ratepayers will have overpaid for Shannopin's capacity. Under the contract, if Shannopin fails to provide capacity for the term of the contract, it must pay West Penn and its ratepayers "capacity termination costs." Armco/Allegheny notes that West Penn maintains a second mortgage on the power plant to secure its interest in the capacity termination costs, and that with a

financing term of twenty rather than fifteen years, there will still be considerable first mortgage debt principal outstanding ahead of West Penn's second mortgage claim for five additional years.

The ALJ concluded that the extension of the financing term "ensures that the EEPA complies with the regulations of the FERC and the goals and provisions of PURPA by reducing the initial principal and interest payments to be made by Mon Valley and thus, facilitating the project in the early stages." (R. 1862a)

That finding is supported by the evidence in the record. The risk that West Penn perceives is speculative, whereas, as the ALJ concluded, adjusting the financing term furthers PURPA's stated objectives of encouraging the use of cogeneration facilities.

▮ Armco/Allegheny also objects to the modification allowing a change in plant ownership, in part because the new ownership "consists primarily of a group of international venture capitalists, foreign business interests, and a subsidiary of a public utility holding company based in Michigan." (Brief at 41)

Although PURPA's goals include the encouragement of reliance upon national resources rather than foreign sources of energy, section 210 has no requirement that utilities enter EEPAs with QFs that are nationally or locally owned. The ALJ and the commission perceived the new ownership as a benefit to the operation of the QF because CMS Generation, a subsidiary of CMS Energy, the Michigan utility company, would assist the project "by providing the financial and technical support of a utility subsidiary." (R. 2032)

▮ Finally, Armco/Allegheny objects to the commission's approval of a change in plant technology. The original EEPA called for the construction of a coal-fired power plant using a circulating fluidized bed boiler. The modification allows the plant to use a pulverized coal boiler and a dry scrubber.

One of Mon Valley's witnesses testified that the use of a pulverized coal burner would be most efficient, would cost less,

and would be more reliable. Significantly, West Penn does not object to this modification, but conditioned its agreement upon the right to review the design Mon Valley intends to use in accordance with Article II of the EEPA and upon agreement with Mon Valley on other changes relating to the change in technology.

Based on the testimony supporting the benefits of this change and the fact that the change will facilitate the project, the ALJ and commission properly granted this modification.

*6. Did the commission err in striking the prepared testimony of two of West Penn's witnesses?*

 West Penn argues that the commission erred in approving the ALJ's decision to strike the testimony of two of its witnesses. That testimony related to calculations of West Penn's alleged present avoided costs and future capacity needs. West Penn purportedly offered the testimony in support of its position that the modifications do not comply with PURPA's requirement that terms of an EEPA be just and reasonable and in the public interest. West Penn argues that the testimony is relevant to the question of whether Shannopin's capacity is needed in this century. If the capacity is not needed, West Penn contends that acquisition of the capacity is not in the public interest, in violation of PURPA.

This court agrees with the commission that the testimony related to matters within the scope of the Phase One proceeding—determination of avoided costs.

Although the stated purpose of the testimony was to establish the capacity needs of West Penn as of the date West Penn and Mon Valley signed the EEPA, the testimony essentially suggests that West Penn had no need for capacity at that time, a curious contention in light of the fact that West Penn entered the EEPA at that time for the purchase of capacity.

Also, as Mon Valley notes, the ALJ and commission were correct in recognizing that the commission could not address avoided costs—an issue that was the subject of the appeal to this court from the Phase One proceeding.

Finally, Armco/Allegheny argues in its reply brief that there are two reasons why the commission should not have granted the modification petition. The first reason is that the developer should have foreseen the litigation delays and thus bears the risk of those delays. However, that rationale is directly contrary to the reasoning of this court's decisions in *Milesburg II* and *Burgettstown.*

The second reason Armco/Allegheny asserts that the commission should not have granted the modification is because Mon Valley did not pursue certain environmental permitting requirements in a timely manner. Armco/Allegheny alleges that the failure to initiate the permit process two years before the original financing closing date meant that Mon Valley could not have complied with the terms of the EEPA anyway. Of course, there is no certainty that Mon Valley could not have obtained the permits within less than two years. Therefore this court is not persuaded by that argument.

*Conclusion*

In accordance with the above discussion, this court affirms the decision of the commission. The commission had jurisdiction to adjudicate Mon Valley's petition for modification, despite the fact that the Phase One aspect of the case had been appealed to this court.

The commission also had jurisdiction to consider Mon Valley's request for a stay of the good faith deposit requirement and had the authority to issue the emergency order pending review of the full commission.

Under PURPA, the commission had the power to grant the modifications of the EEPA, in accordance with this court's decisions in *Milesburg II* and *Burgettstown.* The modifications did not result in a new contract or a new date of a legally enforceable obligation which would require a new determination of avoided costs. The modifications were in accordance with PURPA's requirement that rates in EEPAs be just and reasonable and in the public interest.

## ORDER

NOW, September 3, 1992, the decision of the Pennsylvania Public Utility Commission, dated January 14, 1992, at No. P–880286, is affirmed.

Judge PELLEGRINI, dissenting.

I respectfully dissent. The PUC should have taken into consideration, before granting Mon Valley's request to modify its negotiated power purchase agreement to extend milestone dates, the PURPA mandate that negotiated purchase agreements by an electric utility from a qualifying co-generator facility be just and reasonable to the ratepayers and in the public interest.

In 1978, Congress enacted the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. § 796, which requires, *inter alia,* electric utilities to purchase power from certain types of independently owned electric generating facilities (QFs) [1] in order to encourage alternative energy sources. Pursuant to the federal policy of encouraging privately negotiated PURPA agreements, on October 17, 1987, West Penn Power Company (West Penn) and Mon Valley Energy Corporation (Mon Valley) entered into an Electric Energy Purchase Agreement (Purchase Agreement) to take for 35 years up to 80 megawatts of power from an electric-generating facility fueled by coal to be built by Mon Valley. West Penn entered the Purchase Agreement because it projected that it would need the base-load capacity to be supplied by Mon Valley by 1995.

While PURPA does not require PUC approval of these type of agreements, the Purchase Agreement, however, specifically provided that West Penn was under no obligation to purchase power until the Pennsylvania Public Utility Commission approved it and entered a final order beyond appeal that:

● the Purchase Agreement was in compliance with law and public policy;

1. A "qualifying co-generation facility" (QF) is an electric power producer that meets minimum operating and efficiency standards, as well as certain ownership criteria. 18 C.F.R. §§ 292.203(b), 292.205, 292.206.

- the purchase of power would not result in excess capacity;[2] and

- the amounts paid by West Penn to purchase the power from Mon Valley could be fully passed on to West Penn ratepayers.

By requiring PUC approval of these conditions, West Penn transferred all risk to its ratepayers that if the power received under this "take or pay" Purchase Agreement was not needed, then the burden to pay for the power would shift on its ratepayers, not its shareholders.

On July 18, 1988, without a hearing, the PUC entered a tentative order approving the Purchase Agreement. Because of our decision in *Barasch v. Pennsylvania Public Utility Commission*, 119 Pa.Commonwealth Ct. 81, 546 A.2d 1296 (1988) (*Milesburg I*) requiring a due process hearing before the approval of any agreement to purchase power from cogeneration facilities, the PUC withdrew its tentative order. After providing the required hearing, the PUC again entered an order approving the Purchase Agreement. Armco Advanced Metals Corporation and Allegheny Ludlum Corporation (Industrials), two large industrials, both appealed the decision to this court.

By an unpublished Memorandum Opinion in *Armco Advanced Materials Corporation v. Pennsylvania Public Utility Commission*, 135 Pa.Cmwlth. 15, 579 A.2d 1337 (1990) (*Shannopin I*), this court modified the PUC approval by providing

2. Where the PUC determines that a utility is producing excess capacity, it may exclude the value of the property producing the excess from the rate base and disallow the utility's return on that property. Section 1310(d) of the Public Utility Code, 66 Pa.C.S. § 1310(d), states that:

Whenever the commission, ... shall be of the opinion that any rates of such public utility are producing a return in excess of a fair return upon the fair value of the property of such public utility, used and useful in its service, the commission may, by order, prescribe for a trial period of at least six months, ... temporary rates ...

"Used and useful in its service" is interpreted by the PUC to mean whether a property's total capacity is commensurate with the requirements for peak demand, plus a reasonable reserve margin relative to the system and obligation. *Pennsylvania Power and Light Company v. Pennsylvania Public Utility Commission*, 101 Pa.Commonwealth Ct. 370, 516 A.2d 426 (1986).

that the calculation of capacity costs reflect factors in existence at the time the Purchase Agreement was executed rather than at the time serious negotiations were conducted between the parties. On the same date that we issued our decision in *Shannopin I,* we issued our opinion in *Armco Advanced Materials Corporation v. Pennsylvania Public Utility Commission,* 135 Pa.Commonwealth Ct. 15, 579 A.2d 1337 (1990) (*Milesburg II* ), which dealt with that issue, as well as other issues that are relevant here.

Before we issued our decision in *Shannopin I,* Mon Valley filed a Petition for Modification of an Electric Purchase Agreement and a Motion to Enjoin West Penn Power from requiring them to make a good faith deposit as required by the Purchase Agreement. At the hearing before the Administrative Law Judge (ALJ) in 1991, West Penn admitted that it made an error in its 1987 projection that it would need the base load power in 1995.[3] Instead, it now projected that it would only need low cost combustion turbine peaking units sometime in 1999–2000. Finding that the current need for capacity could not be considered because that issue was determined in *Shannopin I,* the ALJ refused to allow into evidence that this capacity was not now needed. The ALJ, however, did recommend granting Mon Valley's request for modifications, as supplemented, as well as a stay from payment by Mon Valley of good faith money to West Penn. The PUC, by order, adopted the ALJ's recommendations. West Penn and the Industrials then filed the instant appeal.

In *Milesburg I,* we decided a hearing was required for PUC approval on purchase power agreements; in *Milesburg II,* we decided that the PUC had the authority to modify negotiated purchase agreements to compensate for litigation delay; and here, we are called upon to decide what limits are placed on the PUC in granting modifications and what factors it has to

---

3. A utility's load is the sum of all customer demands at a given time. "Base load" is the amount of demand that is needed to be met at all times. "Peak load" is the highest point of demand over a period of time, e.g., annual or daily peak load. "Capacity" is the amount of power the utility has available to meet all its needs. See: *Pennsylvania Public Utility Commission Rate Case Handbook,* pp. 12–14.

take into consideration when exercising that authority to modify.

I do not disagree that the PUC can extend milestone dates set forth in a purchase agreement if necessitated by litigation delay to foreclose the purchase agreement to prevent it from lapsing under its own terms. However, I believe that the PUC, when asked to modify an agreement, must also consider if such extensions are in the best interest of ratepayers and the public. PURPA requires that purchase power agreements "be just and reasonable to the electric consumers of the electric utility and in the public interest." 16 U.S.C. § 824a–3(b)(1) and 18 C.F.R. § 292.304(a). Unlike what the PUC appears to believe, it does not mandate that QFs be built at all costs.[4]

West Penn attempted to show before the PUC[5] that modifying the Purchase Agreement was not in the ratepayers' best interest because the 1987 projection that it would need additional base rate power in 1995 that Mon Valley would supply has proven to be erroneous. Because its forecast was erroneous, the avoided costs,[6] upon which the amount West Penn would pay Mon Valley was calculated, was also incorrect. If

4. I recognize that the purpose of PURPA was to remove barriers erected by utilities to the entry of QFs in the market place. However, Congress did not intend the ratepayers to subsidize their construction or operation. The Conference Committee stated:

The conference recognizes that cogenerators and small power producers are different from electric utilities, not being guaranteed a rate of return on their activity generally or on their activities vis-a-vis the sale of power to the utility and whose risk in proceeding forward in the cogeneration or small power production enterprise is not guaranteed to be recoverable.

＊　　＊　　＊　　＊　　＊　　＊

The provisions of this section are not intended to require the ratepayers of a utility to subsidize cogenerators or small power producers. H.R.Conf.Rep. No. 95–1750 p. 97–98 (1978); reprinted in 1978 U.S.C.C.A.N. 7659, 7831–7832.

5. The ALJ struck written testimony of two West Penn witnesses covering West Penn's future capacity needs and avoided costs.

6. "Avoided costs" means the incremental cost to an electric utility of electric energy or capacity or both, which, but for the purchase from the qualifying facility, such utility would generate itself or purchase from another source. 18 C.F.R. § 292.101(b)(6)(4–1–86).

required to pay that rate for that power, $500,000,000 more in rates would have to be charged to its ratepayers to cover the cost of this unneeded capacity.

The PUC and the majority find that the original purchase agreement forms the basis of the continued obligation on the part of the utility to acquire energy from the QF, even though at the same time allowing alterations for the benefit of the QF to mitigate the effects of litigation delay.[7] This position does not recognize that there is a third party to these agreements, whose interest under PURPA, must also be protected—the ratepayers. Because the Purchase Agreement is "take or pay", *West Penn ratepayers, not* West Penn, will be forced to pay an additional $500,000,000 in rates for unneeded power.

We have previously held that by bringing the Purchase Agreement before the PUC for modification, the Purchase Agreement became subject to scrutiny to determine if the purposes of PURPA are being fulfilled. In *Milesburg II*, addressing the extent of power that the PUC has to rescue a QF from a bad bargain, and the risk that a utility takes by making a purchase agreement subject to PUC approval to insure that all costs are passed to ratepayers, we stated:

> The question underlying most of the Phase Two issues is the degree to which a QF has the power to bargain away the rights and advantages conferred on it by PURPA, or, conversely, the extent of the power of the PUC to rescue a QF from a bad bargain. Where a utility privately negoti-

7. The majority discounts West Penn's contention that the power is unneeded and excess, finding that "[t]his argument appears to be disingenuous based on West Penn's conduct and contract it entered into with Mon Valley for Shannopin's capacity when it first sought approval [1987] of the original [purchase agreement]." By saying that West Penn is disingenuous for claiming that the base load to be supplied by Mon Valley is not needed, it makes, in effect, a finding without having the benefit of evidence West Penn was precluded from offering to show that this power was not needed, that it is needed. Moreover, rather than lacking in candor, by this statement, West Penn is properly informing the PUC that the passage of time has shown that its projection of expected base capacity demand was erroneous. The majority's statement is like telling a weather reporter that he or she is disingenuous for telling you it's sunny outside when he or she forecast rain yesterday.

ates and executes a contract with a QF, the parties may agree to virtually anything, and the terms of their agreement are legal and enforceable. However, when the utility chooses not to accept the risk that rates it has negotiated will be proper and recoverable, but conditions its obligations on pre-approval by the PUC, then the utility subjects the entire agreement to the scrutiny of the PUC and incurs the risk that the PUC may modify other provisions of the contract if its concludes that they are not in accordance with PURPA and the FERC regulations.

This concept, that by the parties making the Purchase Agreement subject to PUC approval, the utility incurs a risk that the PUC may rescue the QF from its bad bargain, is equally applicable to recusing the ratepayers from a purchase agreement that is no longer "just and reasonable" or in the public interest. When the QF requests the PUC to grant modifications to the negotiated Purchase Agreement, it also should similarly incur the risk that the PUC will modify the contract if it finds that the utility made a bad bargain with the QF in calculating the amount of avoided costs and the Purchase Agreement is no longer fair and reasonable to ratepayers as mandated by PURPA. If the PUC can modify a contract to protect a QF from the bad bargain it negotiated for itself, then the PUC can modify a bad bargain for ratepayers, one in which they had no part in negotiating and which they are innocent victims.

I would remand to the PUC to receive evidence as to whether this project will result in excess capacity and if rates negotiated should be modified so that they will be fair and reasonable to the ratepayers.

SMITH and FRIEDMAN, JJ., join in this dissent.