561 A.2d 1224

PENNSYLVANIA PUBLIC UTILITY COMMISSION

v.

PHILADELPHIA ELECTRIC COMPANY.

Appeal of David M. BARASCH, Consumer Advocate.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellant,

v.

PHILADELPHIA ELECTRIC COMPANY, Appellee.

Supreme Court of Pennsylvania.

Argued Jan. 19, 1989.

Decided July 18, 1989.

Reargument Denied Jan. 26, 1990.

Tanya J. McCloskey, Irwin A. Popowsky, Lee E. Morrison, Bohdan R. Pankiw, Harrisburg, Daniel P. Delaney, for appellant.

Robert H. Young, Walter R. Hall, II, Anthony C. DeCusatis, Philadelphia, for Philadelphia Elec. at Nos. 116 & 117.

David Kleppinger, Harrisburg, for Philadelphia Area Indus. Energy Users' Group.

Lee Morrison, Bohdan R. Pankiw, Harrisburg, Daniel P. Delaney, for Pennsylvania Public Utility Com'n at No. 116.

Tanya J. McCloskey, Irwin A. Popowsky, for Office of Consumer Advocate at No. 117.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

ZAPPALA, Justice.

In this appeal, we are requested to review the Opinion and Order of the Commonwealth Court reversing the Order of the Pennsylvania Public Utility Commission (Commission) which had disallowed a $57 million rate increase. 114 Pa.Cmwlth. 22, 538 A.2d 98. The proposed rate increase was necessary to offset energy replacement costs incurred as a result of the closing of the Salem and Peach Bottom nuclear power plants on two occasions each. The Commission denied the Appellee's request, finding that part of the energy replacement costs were caused by mismanagement. Furthermore, the Commission held that since one of the outages was caused by a manufacturing defect and that Appellee was in the best position to pursue redress against the manufacturer, no additional costs should be passed on to the ratepayer. Commonwealth Court reversed, holding that the Commission used an incorrect standard of care to evaluate Appellee's actions and that it was improper to impute a third party's negligence to Appellee under the

current record. Because of the important issues raised, we granted the Appellants' petitions for allowance of appeal.

The requisite facts are not in dispute. On February 22, 1983, while the nuclear reactor at Salem 1 was shut down for a scheduled refueling outage and as attempts were being made to restart the unit, the automatic protection system used to shut down the nuclear reactor failed. However, this failure went undetected until three days later when a second failure occurred. As a result of the second failure, the Nuclear Regulatory Commission (NRC) instituted an investigation which culminated in the Appellee paying an $850,000 fine and the scheduling of a target restart date of May 21, 1983. The NRC investigation uncovered inadequate operations with regard to maintenance and testing of current circuit breakers and related component parts, inadequate training of operators and overall station management. Prior to restarting, NRC required that the Appellee develop and demonstrate procedures to cure these problems. Although the actual restart had been set for April 29, 1983, it had to be cancelled due to Appellee's discovery of shellfish infestation in cooling water lines. Restart finally occurred on May 21, 1983.

The following year, on February 24, 1984, the Salem 1 generator failed. It appears that this failure was caused by the defective manufacturing of resins which surround the coils that protect the generator from the ill effects of vibrations. This power outage lasted until October 22, 1984.

In addition to the problems at the Salem plant, problems were being experienced at the Peach Bottom Plant also. Although originally shut down for refueling, this shutdown period was extended for almost eight months as a result of problems with cracking in pipes, reactor cavity overflow and difficulty in welding and valve joints. Similar problems occurred at a second Peach Bottom unit resulting in a shutdown from July 4, 1983 through December 3, 1983.

After extensive hearings before an administrative law judge, the Appellee's request for reimbursement of energy

replacement costs for the Salem 1 outage of February 1983 and February 1984 were disallowed. In addition, the judge determined that Appellee was responsible for seven days of outage at Peach Bottom Unit 3 and forty hours at Peach Bottom Unit 2. This finding excluded another $2.5 million from the requested rate increase.

On appeal to Commonwealth Court, that Court reversed, finding that the Commission had relied upon an improper standard of care in evaluating the Appellee's actions, that Appellee could not be denied reimbursement of energy replacement costs for Westinghouse's tortious conduct unless the Commission made a finding that Appellee had actual control over Westinghouse, that the NRC was dilatory in approving the restart for Peach Bottom Unit 2 and that the gasket leak in Peach Bottom Unit 3 was totally unforeseeable. Commonwealth Court then remanded the case to the Commission for further development of the record and review in light of that Court's determination as to the proper standard of care.

Our scope of review of the actions of a Commonwealth agency is controlled by statute:

> ... After hearing, the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter A of Chapter 5 (relating to practice and procedure of Commonwealth agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence....

2 Pa.C.S. § 704. In further explaining the court's role in reviewing decisions of the Commission, Commonwealth Court correctly stated:

> [T]he appellate courts cannot conceive an independent judgment from the record, and substitute it for the judgment of the PUC. We may not indulge in the process of weighing evidence in resolving conflicts and testimony. The PUC's discretionary findings and conclusions must be

accepted unless they are totally without support in the record, are based on an error of law, or are unconstitutional.

*Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Company,* 19 Pa.Commw. 214, 220, 341 A.2d 239, 244 (1975), rev'd on other grounds, 492 Pa. 326, 424 A.2d 1213 (1980), cert. denied 454 U.S. 824, 102 S.Ct. 112, 70 L.Ed.2d 97 (1981). See also, *McGovern's Estate v. State Employee's Retirement Board,* 512 Pa. 377, 517 A.2d 523 (1986).

 In this appeal we are requested to review the propriety of a requested rate increase. Under Section 1301 of the Public Utility Code, 66 Pa.C.S. § 1301, all established rates must be just and reasonable:

> Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission. . . .

66 Pa.C.S.A. § 1301. In determining whether a rate increase is "just and reasonable", the Commission must balance the prices charged to the customer with the rate of return on capital to the investor. *Pennsylvania Electric v. Pennsylvania Public Utility Commission,* 509 Pa. 324, 502 A.2d 130 (1985). Furthermore, in undertaking this balancing process, the Commission must take into consideration reasonable costs of producing the power source. *Metropolitan Edison v. Pennsylvania Public Utility Commission,* 62 Pa.Commw. 460, 437 A.2d 76 (1981), allocatur denied 1982. Although the Commission is a watchdog for the public and against unreasonable rates, the Commission must not interfere with managerial decisions of a utility absent an abuse of discretion. Commonwealth Court has aptly characterized the interplay between the Commission, the utility and the public as follows:

> It is also fundamental that the Commission has an ongoing duty to protect the public from unreasonable rates while insuring that utility companies are permitted to charge rates sufficient to cover their costs and provide a

reasonable rate of return. *Commonwealth v. Duquesne Light Co.,* 469 Pa. 415, 366 A.2d 242 (1976). Recognizing the Commission's duty to the public and a utility's right of self-management, our courts adopted the further proposition that it is not within the province of the Commission to interfere with the management of a utility unless an abuse of discretion or arbitrary action by the utility has been shown. *Lower Chichester Township v. Pennsylvania Public Utility Commission,* 180 Pa.Super. 503, 511, 119 A.2d 674, 678 (1956); *Pittsburgh v. Pennsylvania Public Utility Commission,* 173 Pa.Super. 87, 92, 95 A.2d 555, 558 (1953); see *Pennsylvania R.R. v. Pennsylvania Public Utility Commission,* 396 Pa. 34, 40, 152 A.2d 422, 425–26 (1959) (Bell, J., dissenting); *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission,* 17 Pa.Cmwlth. 333, 339–40, 331 A.2d 572, 575 (1975). An obvious corollary of the above proposition is that if there has been an abuse of managerial discretion, and the public interest has been adversely affected thereby, then the Commission is empowered to intervene.

62 Pa.Commw. at 467, 437 A.2d at 80. Lastly, in determining whether management has abused its discretion in operating a utility, the Commission cannot fall prey to judging management action by hindsight. Instead, management's actions must be judged on what it knew or should have known at the time in question. *Pittsburgh v. Pennsylvania Public Utility Commission,* 370 Pa. 305, 88 A.2d 59 (1952) and *National Fuel Gas Distribution Corp. v. Pennsylvania PUC,* 76 Pa.Commw. 102, 464 A.2d 546 (1983).

█ In vacating the order of the Commission with respect to the first outage at Salem 1, Commonwealth Court held that the Commission imposed an improper standard of care upon the Appellee. The NRC requires that plant operators exercise a high degree of care in operating and maintaining their facilities. Commonwealth Court agreed with the Appellee that the PUC adopted this heightened degree of care in this proceeding. Since the primary pur-

pose of a rate case is to evaluate the effect of a rate increase on the customer and investor so as to avoid unreasonable utility costs, Commonwealth Court concluded that the heightened standard of care required to ensure safety is inappropriate.

While Commonwealth Court correctly states the various principles of law, we cannot agree with its application of those principles. There is no question that the Commission was concerned with numerous NRC violations. It is also true that the Commission acknowledged the high degree of care required by the NRC. However, in addressing these standards, the Commission did not alter the burden of proof required, but concluded that the Appellee's failure to adhere to the NRC's requirements resulted in outages and delays in restarting the operations. According to the Commission's analysis, if the Appellee had operated its plants in accordance with the NRC's regulations, the mechanical failures would have either been detected or prevented. Because of the Appellee's lack of a sufficient maintenance policy, the failure of the protection system occurring on February 22, 1983 was not even detected until the second failure. Thus, the Commission was not merely ensuring safety but rather was evaluating whether the replacement costs were prudent given the Appellee's lack of maintenance and operating practices.

The use of the term "high degree of care" may have been inappropriate but the Commission's application of its enunciated degree of care is consistent with our prior holdings. *Pennsylvania Electric v. Pennsylvania Public Utility Commission, supra; Metropolitan Edison v. Pennsylvania Public Utility Commission, supra; Pittsburgh v. Pennsylvania Public Utility Commission, supra* and *National Fuel Gas Distribution Corp. v. Pennsylvania PUC, supra.* If the Appellee acted imprudently in failing to have appropriate maintenance and operating practices and as the result of that failure the power plants were unable to supply energy to its customers, management has acted

arbitrarily and abused its discretion. Such additional costs would not therefore be just and reasonable.[1]

■ Next, Commonwealth Court vacated that part of the Commission's order which denied replacement costs due to defective manufacturing of coils. The Court also remanded this issue to the Commission for a determination of whether the Appellee exercised any control over the manufacturer.

There appears to be no dispute that the Appellee played no part in the manufacturing of the defective resins. Thus, the initial outage due to the malfunction of these resins cannot be attributed to the Appellee. By disallowing the replacement costs, the Commission held that the utility and not the ratepayers were in a far superior position to seek redress for the defects and negotiate contractual protections to minimize any future problems. Appellee argued successfully before Commonwealth Court that unless the Appellants can demonstrate that the utility exercised some form of control over the contractor, the utility cannot be held responsible for replacement costs arising out of defective component parts.

While Appellee's argument does have merit, we believe a utility company is in a better position to prevent an occurrence or provide for protection against any such occurrence. After all, it was the utility which chose the contractor, negotiated the contract and is in a position to seek damages for any losses sustained under the contract. While the utility may have to bear the initial losses incurred as the result of its contractor's negligence, it is in a far better position to aggressively pursue the tortfeasor for reimbursement. If we were to hold otherwise, the utility would have no incentive to pursue the tortfeasor, having already received full compensation for its losses. On the other

1. We also agree with the Commission's conclusion with regard to the shellfish infestation. Substantial evidence was presented to the Commission to establish that the shellfish infestation could have been corrected by sequential flushing of the unit's component parts rather than a complete shutting down of the entire unit. Accordingly, we agree with the Commission's conclusion that the energy replacement costs incurred as a result of the shellfish infestation could not be charged to the ratepayers.

hand, ratepayers would not be in a position either legally or financially to pursue the alleged tortfeasor. Balancing, as we must, the equities involved to determine whether a requested rate increase is just and reasonable, *Pennsylvania Electric v. Pennsylvania Public Utility Commission, supra*, we must agree with the Commission that all energy replacement costs incurred by the Appellee as a result of faulty resins must be borne by the utility and not the ratepayers. Accordingly, the Commonwealth Court erred in vacating the Commission's order in this respect.

Finally, outages also occurred at the Peach Bottom Plant during 1983 and 1984. In 1983, cracking was discovered at several weld locations in piping at Peach Bottom Unit 3. The Appellee did reinforce the designated welds but the NRC nevertheless delayed restart authorization for several weeks. The Commission disallowed approximately $2 million in requested energy replacement costs over a seven day period because of the Appellee's failure to timely submit a necessary affidavit. The Commonwealth Court vacated this disallowance based upon its perception of the Commission's improper designation of the applicable standard of care. Because we find no fault in the Commission's standard of care, we must reverse the Commonwealth Court with respect to these energy replacement costs.

In 1984, a second outage occurred at Peach Bottom, this time in Unit 2. Contrary to the Commission's findings, the problem in Unit 2 involved a gasket leak not cracks in the fuel pool gates. Since the problems in both units were distinct, the Commission erred in disallowing the energy replacement costs for the period of time necessary to make repairs to an unforeseeable period. The Commission's findings are not supported by substantial evidence, therefore Commonwealth Court correctly vacated the Commission's order with respect to this request.

The Order of the Commonwealth Court is affirmed in part and reversed in part.[2]

2. Commonwealth Court also vacated and remanded a disallowance of energy replacement costs incurred as a result of an outage at Eddy-

348

STOUT, Former Justice, did not participate in the decision of this case.

stone I. Because neither party sought our review of this determination, this limited issue must be remanded to the Commission in accordance with the Order of Commonwealth Court.