629 A.2d 221

**ARMCO ADVANCED MATERIALS CORPORATION and Allegheny Ludlum Corporation, Petitioners,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**WEST PENN POWER COMPANY, Petitioner,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 10, 1993.

Decided July 15, 1993.

Michael L. Kurtz, for petitioners, Armco Advanced Materials Corp. and Allegheny Ludlum Corp.

Thomas K. Henderson, for petitioner, West Penn Power Co.

Lee E. Morrison, Asst. Counsel, for respondent.

Clifford B. Levine, for intervenor, Mon Valley Energy Corp.

Marvin A. Fein, for intervenor, North Branch Energy Partners, L.P.

Before DOYLE and PELLEGRINI, Judges, and KELTON, Senior Judge.

PELLEGRINI, Judge.

West Penn Power Company (West Penn) and two of its large industrial customers, Armco Advanced Materials Corporation and Allegheny Ludlum Corporation (Industrials), have filed consolidated appeals from an order of the Pennsylvania Public Utility Commission (PUC) adopting from North Branch Energy Partners, L.P. (North Branch) rather than from West Penn, the recalculation of avoided cost as of October 15, 1987, relative to the purchase of power by West Penn from the Burgettstown Project.

As with most cases involving purchase power agreements, this appeal has a long history with unexpected twists and turns. It arises as a result of the remand order we issued in *Armco Advanced Materials Corporation and Allegheny Ludlum Corporation, et al. v. Pennsylvania Public Utility Commission* (Nos. 2090 and 2097 C.D.1989, filed September 7,

1990), *petition for allowance of appeal denied,* No. 31 W.D. allocator Docket 1990 (November 19, 1991), *petition for reconsideration denied,* (February 3, 1992) (*Burgettstown I* ). In that case, North Branch proposed to build and operate a qualifying cogeneration facility (QF)[1] in Robinson Township, Washington County (Burgettstown Project), capable of providing up to 80 megawatts (MW) of power for 33 years. The QF would be fueled by coal waste located at the project site.

In 1985, North Branch began "serious negotiations" with West Penn to sell it capacity from its proposed power plant. Negotiations continued for more than two years, and on October 15, 1987, the parties executed an electric energy purchase agreement (EEPA). That agreement provided that the avoided cost rate would be 3.6 cents per kilowatt hour (kwh) based upon West Penn's avoided cost as of October 6, 1986, also the time of serious negotiations between the parties, with an expected in-service date of October, 1991. West Penn's decision to enter into the EEPA was based on its future anticipated need to purchase electric power, as determined by West Penn's parent company, the Allegheny Power System (APS).

On January 5, 1988, West Penn filed a petition with the PUC requesting approval of the EEPA and of rate recovery from its ratepayers. The petition also requested that the PUC provide notice and a comment period to satisfy the due process rights of ratepayers. The Industrials filed a petition to intervene arguing that the EEPA should not be approved because the avoided cost rate was excessive. Without providing for the requested notice or a comment period, the PUC issued an order on September 29, 1988, approving the EEPA based on West Penn's avoided cost calculated at the time of serious negotiations on October 6, 1986, and authorizing rate recovery of costs.

1. Section 201 of the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. § 796(18)(A), defines a cogeneration facility as one which produces electric energy and steam or forms of useful energy (such as heat) which are used for industrial and commercial heating or cooling purposes.

After the PUC entered its order, this court in *Barasch v. Pennsylvania Public Utility Commission,* 119 Pa.Commonwealth 81, 546 A.2d 1296, *reargument denied,* 119 Pa.Commonwealth Ct. 81, 550 A.2d 257 (1988), *petition for allowance of appeal denied,* 523 Pa. 652, 567 A.2d 655 (1989) (*Milesburg I*), held that before the PUC could approve a contract for a utility's purchase of power from a QF which involved substantial payments for such capacity, due process required that the utility's customers be provided with notice of the proceedings and an opportunity to be heard because substantial property rights were involved.

Pursuant to our holding in *Barasch,* the PUC withdrew its order, consolidated several appeals regarding other similar projects[2] and heard the Burgettstown Project approval petition. Subsequently, North Branch filed a petition requesting a modification of the EEPA, stating that because of delays in the approval petition, it would not be able to meet the existing financing closing date of October 1, 1989. North Branch requested the PUC to modify the EEPA by setting the closing date as six months from the date of a final order of the PUC in the proceeding and adjusting other milestone dates accordingly. The modification petition also requested an increase in the agreed upon avoided cost of 3.6 cents/kwh to 4.65 cents/kwh based on the change of the in-service date from October of 1991 to January of 1993 due to litigation delays.

At the hearings, the Administrative Law Judge (ALJ) bifurcated the proceedings into two phases. Phase One concerned issues relating to the capacity rates to be paid to North Branch, and Phase Two concerned issues raised by North Branch's modification petition. The ALJ issued a recommended decision approving the capacity rate of 3.6 cents/kwh based upon West Penn's avoided cost as of October 6, 1986, the time of serious negotiations between the parties.

As to the Phase Two issues, the ALJ recommended that North Branch's modification petition be denied because, while the delays caused by the litigation were not foreseen, the

2. Those other QF cases simultaneously heard included the Milesburg, Shannopin and Monongahela Lock and Dam power plants.

parties had voluntarily agreed to various risks in the original negotiations and in the EEPA.[3] By order dated September 29, 1989, the PUC adopted the ALJ's recommendations as to Phase One issues approving the EEPA between West Penn and North Branch and recovery of costs through the energy cost rate at the time of serious negotiations. However, the PUC reversed the ALJ's recommendation and granted North Branch's modification petition, stating that if it were denied, the EEPA would expire by its own terms on October 1, 1989, and would send the erroneous message to those opposing future QFs that they could win by default merely by the passage of time. Because North Branch had previously withdrawn its request for an increase in its avoided cost, the PUC did not address that issue.

The Industrials filed an appeal with this court from the PUC's decision. They argued that the PUC's policy of calculating avoided costs as of the time of serious negotiations was invalid pursuant to 18 C.F.R. § 292.304(d), which required avoided cost to be calculated at the time a legally enforceable obligation was incurred. Further, due to tax changes occurring between 1986 and 1987, the payment to North Branch should be modified to reflect those changes. West Penn also argued that the PUC had improperly extended the milestone dates for the Burgettstown Project and the EEPA had expired by its own terms.

We determined that the PUC had properly exercised its authority in ordering a modification of the contract milestone dates.[4] We also agreed that avoided cost was to be calculated

3. North Branch filed a motion for reconsideration of the ALJ's decision which was denied. Contemporaneously with that filing, North Branch withdrew its request for an increase in the capacity credit.

4. We did so because West Penn's challenges to the PUC's order regarding the milestone dates were without merit. West Penn first argued that the PUC failed to make the determination required by Section 508 of the Public Utility Code, 66 Pa.C.S. § 508, that the milestone dates were contrary or adverse to the public interest. However, while Section 508 gives the PUC the power to modify contract terms, the PUC did not exercise its power under state law, but rather under Section 210 of PURPA, 16 U.S.C. § 824a–3, which creates a federal statutory duty requiring utilities to purchase energy from QFs. As such, the PUC's

as of the time that a legally enforceable obligation was incurred by North Branch to deliver capacity to West Penn, and that date was October 15, 1987, when the EEPA was signed. We then issued an order remanding the case to the PUC to make a new calculation of avoided cost using factors in existence at the time the EEPA was executed rather than at the time of serious negotiations.[5]

Pursuant to our remand order, the PUC directed the parties to submit a recalculation of avoided cost using all avoided cost inputs as of the time of the legally enforceable obligation.[6] Without the benefit of an evidentiary hearing, North Branch, West Penn and the Industrials submitted their recalculations to the PUC. North Branch's recalculation based on all avoided cost inputs from the time of the legally enforceable obligation increased the agreed upon 3.6 cents/kwh to 4.91 cents/ kwh based on an in-service date of July 1, 1994 (with a range up to 5.71 cents/kwh based on an in-service date of October 1, 1995 or later). West Penn's recalculation using all avoided cost inputs as of October 15, 1987, went from the agreed upon 3.6 cents/kwh down to zero based on its determination that the capacity needs forecasted by APS in 1986 had totally diminished by October of 1987. The Industrials submitted the expert testimony of Stephen J. Baron who relied on planning docu-

action dealt with the utility's public service obligation as required by PURPA. West Penn also argued that the PUC erred by ordering indefinite milestone dates because fixed dates are necessary to protect West Penn and its ratepayers. However, the PUC did not eliminate milestone dates, but rather moved them forward to allow for litigation delays so as to comport with our decision in *Milesburg I.*

5. West Penn and the Industrials filed a petition for allowance of appeal with the Pennsylvania Supreme Court. A cross-appeal was filed by the PUC. By order dated November 19, 1991, both appeals were denied. The parties then filed petitions for reconsideration before this court which were also denied by order dated February 3, 1992.

6. For an unknown reason, the PUC also requested the parties to submit a recalculation of avoided costs using the tax rates from the time North Branch incurred a legally enforceable obligation on October 15, 1987, but using all other avoided cost inputs as of the time of serious negotiations. North Branch's recalculation under that constraint ranged from 5.15 cents/kwh to 6.06 cents/kwh, and West Penn's recalculation ranged from 4.89 cents/kwh to 5.75 cents/kwh.

ments available as of October 15, 1987, and also argued that West Penn had no need to purchase power in 1987.[7]

By order dated November 24, 1992, the PUC rejected both West Penn's and the Industrials' submittals indicating that West Penn had no capacity need. The PUC stated that West Penn's argument was inconsistent with the very act of signing the EEPA, and found meritless both parties' contention that West Penn's capacity needs had changed from 900 MW of additional capacity, as projected in 1986 based on APS plans to build a 900 MW plant, to zero by October 15, 1987. Moreover, the PUC noted that this issue had already been determined in the companion case of *West Penn Power Company, et al. v. Pennsylvania Public Utility Commission,* 150 Pa.Commonwealth Ct. 349, 615 A.2d 951 (1992), *reargument denied,* November 10, 1992, *petitions for allowance of appeal filed* at Nos. 663 and 672 W.D. Docket 1992 (*Shannopin II* ),[8] where this court held that a hindsight determination of a change in capacity need was not to be considered when recalculating avoided cost as of the date the legally enforceable obligation was incurred.

The PUC then stated in its order that it accepted North Branch's recalculation of avoided cost, which only considered inputs at the time of the legally enforceable obligation.[9]

7. He argued, though, that if power was needed as of that date, the recalculated avoided cost would range from .69 cents/kwh with an in-service date of July 1, 1994, to .81 cents/kwh with an in-service date of October 1, 1995.

8. That first case involving the Shannopin power plant was *Armco Advanced Materials Corporation and Allegheny Ludlum Corporation v. Pennsylvania Public Utility Commission* (No. 2091 C.D.1989, July 17, 1991), *petition for allowance of appeal denied,* No. 545 W.D. Allocator Docket 1990 (November 19, 1991) (*Shannopin I* ). Similar to the proceedings below in this case, that case also determined that avoided costs had to be calculated as of the time a legally enforceable obligation had been incurred rather than at the time of serious negotiations. Because that had not been done, we issued a remand order requiring the PUC to recalculate such costs as of the date the contract was signed between the parties.

9. North Branch's recalculation was based on changes in the federal and state tax rates, the cost of money, construction costs and the fixed change rate for coal generation facilities, and the continued capacity need for the power it was to produce.

Those figures indicated varying capacity rates from 4.91 cents/kwh with an in-service date of July, 1994, to 5.71 cents/kwh with an in-service date of October 1, 1995. The PUC also indicated in its order that the financing closing date would be six months from the date that the PUC's order became final and nonappealable, and that the other milestone dates were to be adjusted accordingly. These consolidated appeals by West Penn and the Industrials followed.

## I.

West Penn and the Industrials' core contention is that the PUC erred by accepting North Branch's recalculation of avoided cost rather than West Penn's or the Industrials' because they provided sufficient evidence that North Branch's power was excess power as of October 15, 1987. West Penn contends that its figures now establish that the power is unneeded and the PUC erred in refusing to consider the evidence it offered. The Industrials contend that the evidence it offered was credible, and that it established on October 15, 1987, the date the EEPA was signed, that a reasonable person would have known that the power was excess capacity.[10]

Not totally unexpected because it had projected the need for the power when it signed the EEPA, West Penn relied totally on information it gleaned after the date of the legally enforceable obligation. It argues that use of such information was proper because it is a more accurate reflection of its power need. As to the date which should be used to calculate avoided cost, we stated in *West Penn Power Company et al. v. Pennsylvania Public Utility Commission*, 154 Pa.Commonwealth Ct. 136, 623 A.2d 383 (1993) (*Shannopin III*), that the

10. West Penn also argues that the PUC erred by dismissing four additional documents it wished to place into evidence regarding its change in capacity need because they were obtained after the EEPA was signed and were not part of the original hearing record. As such, West Penn believes that because the only evidence of record goes to the date of serious negotiations in 1986, of which the PUC took judicial notice, there was no evidence as to change in factors as of 1987. However, these documents were excluded because the PUC determined that they did not support or explain the recalculations made by West Penn.

PUC had to base its avoided cost calculation on whether the capacity was needed on factors *known as of the date the legally enforceable obligation was incurred.*[11] In that case, the issue was whether the PUC improperly implemented our remand order in *Shannopin I* by only recalculating corporate tax rates as of the date there was a legally enforceable obligation, and not recalculating all other factors as of that date which made up the avoided cost. We determined that the PUC had erred because our order anticipated a recalculation encompassing *all* avoided cost figures as of October 15, 1987. "Because a determination of whether an avoided cost element of the capacity cost credit is fair is based on time sensitive data, the PUC cannot change just one element to obtain an accurate calculation. It has to make that determination as if that calculation had not been made before and examine all the elements that determine avoided cost [as of October 15, 1987]." *Id.,* at p. 145, 623 A.2d at 387.

Moreover, in *Shannopin II,* West Penn and the Industrials also argued that based on hindsight information, West Penn no longer had any need to purchase capacity produced from the Shannopin Mine Project. In that case, we expressly rejected the use of the hindsight information because if there was no litigational delay and the agreement became effective when signed, neither the utility nor ratepayers would be able to challenge the agreement. At least as to QFs, time was frozen when the EEPA became effective, and all calculations had to be made as of that date. *Shannopin III.* Because the recalculation of avoided cost had to be based on information known as of that date, and West Penn's evidence was based on hindsight, the PUC properly excluded its recalculation.[12]

11. The standard used by the PUC was whether a reasonable person could have discerned or should have discerned on October 15, 1987, that power was or was not needed and the amount of avoided cost based upon inputs available as of that date.

12. As West Penn recognized, to adopt its position, we would be required to overrule our decision in *Shannopin II* where we held that even if it was determined based on hindsight information after the EEPA was signed that power was no longer needed, ratepayers were required to pay for that power. The dissent to that opinion (Pellegrini, J., joined by Smith, J. and Friedman, J.), however, would have allowed

As to the Industrials' recalculation based on its expert's testimony purportedly using inputs as of October 15, 1987, that West Penn did not need any new baseline capacity,[13] the PUC rejected that opinion because it simply did not find the expert credible. The PUC stated:

> [T]he testimony is inconsistent with that presented by the same witness in the proceedings in chief in March of 1989. Specifically, although Armco/Allegheny had previously disagreed with a number of elements of the original West Penn calculations, it's witness in 1989 testimony *presumed* the use of a *base load coal plant* although he *now* suggests that as of October, 1987, the proper unit to use was a combustion turbine. [T]he Armco/Allegheny witness also changed a number of other factors for purposes of this proceeding, although he contends that both sets of figures were appropriate for October 15, 1987.

(PUC Opinion and Order dated November 24, 1992, at pp. 8–9.)

 The PUC is empowered to make credibility determinations of the evidence presented. *Pennsylvania Electric Company v. Pennsylvania Public Utility Commission,* 81 Pa.Commonwealth Ct. 285, 473 A.2d 704 (1984). In this case, the PUC found the Industrials' expert's testimony as to West Penn's capacity need as of October 15, 1987, not credible. As

a change in capacity need based on that type of information in fairness to the ratepayers who would be saddled with paying for the excess power as opposed to the utility that signed the agreement.

13. Stephen Baron testified as follows before the PUC:

Q. Are you relying on hindsight to determine today what could have, or should have been known, as of the contract signing date?

A. No. All of the information that I have relied upon is extracted from planning documents available to all parties at or around the October 15, 1987 time of the contract signing. These documents include the Company's Integrated Resource Plan as well as the testimonies of intervenors which reflected the realities of the planning environment at that time. A review of the extensive record in this case clearly shows that by the time of the October 15, 1987 contract signing date, the Company's need for and timing of new capacity as well as the type and cost of new capacity had changed significantly from the earlier period defined as the time of serious negotiations.

(Reproduced Record at p. 1655a.)

such, the evidence offered by the Industrials was insufficient evidence to prove that West Penn had no need to purchase capacity when it signed the EEPA. Because North Branch's recalculation was the only recalculation submitted based only upon factors known to them as of October 15, 1987, the PUC did not act improperly by accepting that recalculation.

## II.

■ West Penn and the Industrials argue next that the PUC improperly interfered with an internal management decision made by West Penn that it no longer needed any capacity when it determined that West Penn had future capacity needs as agreed to in the EEPA signed on October 15, 1987. Citing *Pennsylvania Public Utility Commission v. Philadelphia Electric Company*, 522 Pa. 338, 561 A.2d 1224 (1989), they contend that the management decisions regarding a power plant are to be left to the utility, and the PUC cannot interfere with those decisions unless there has been an abuse of discretion. However, here the PUC did not interfere with a management decision to purchase power, it just refused to allow West Penn to back out of an agreement to purchase power.

West Penn made an internal management decision that it had future need to purchase power, and acknowledged this need formally when it signed the EEPA on October 15, 1987. The parties to that agreement requested the PUC to approve its terms, which the PUC did with modifications for litigation delay. Because West Penn legally agreed it had capacity needs to be met at future dates, it cannot now point to the PUC and claim interference with that decision just because, in hindsight, it believes it made an erroneous decision.[14] Because the PUC, in keeping with the above-cited cases, is only requiring that West Penn not change the terms of the original

14. Where the PUC determines that a utility as opposed to a QF is producing excess capacity, it may exclude the value of the property producing the excess from the rate base and disallow the utility's return on that property. *See* Section 1310(d) of the Public Utility Code, 66 Pa.C.S. § 1310(d). However, when the PUC approves an EEPA between a QF and a utility, the risk of excess capacity is shifted to the ratepayers who are required to pay for it even if it later is determined it is not needed.

EEPA regarding capacity need based on hindsight informa-
tion, we find there has been no interference by the PUC on
this recent decision made by West Penn.[15]

## III.

■ West Penn and the Industrials also argue that North
Branch waived its right to request an increase from the
agreed upon avoided cost of 3.6 cents/kwh to its recalculation
ranging from 4.91 cents/kwh to 5.71 cents/kwh. They contend
that North Branch withdrew that request with its contempora-
neous filing of its petition for reconsideration of the ALJ's
decision denying its request for contract modification and
increased avoided cost. While it is true that North Branch
voluntarily withdrew its request for an increase in the capacity
rate, this court's remand order specifically required a recalcu-
lation of the rate to be paid to the QF by the utility as of
October 15, 1987, the date of the legally enforceable obligation.
Anything which transpired prior to that date, including North
Branch's withdrawal of its request, is irrelevant for purposes
of complying with that order.[16]

## IV.

■ Finally, West Penn and the Industrials argue that the
PUC erred by failing to grant their request for an evidentiary
hearing on the recalculation of avoided cost so that they could
provide additional evidence regarding the dramatic change in
West Penn's capacity need as of October 15, 1987. They also
contend that West Penn's customers were entitled to be

15. Moreover, PURPA requires interference with managerial decisions
as far as contracts are concerned when a QF has energy to sell and a
utility has a need to purchase energy. Section 210(a) of PURPA, 16
U.S.C. § 824a–3, which was designed to lessen the dependence of
electric utilities on foreign oil and natural gas by encouraging the
development of alternative power sources in the form of QFs, provides
that the PUC shall prescribe such rules as necessary to encourage QFs
to sell electric energy and electric utilities to purchase that energy from
such facility.

16. Similarly, had North Branch's request remained in place and re-
ceived the PUC's approval, the avoided cost approved would also have
been subject to recalculation as of the date the EEPA was signed.

informed of the recalculation so that their concerns could be heard as well.

In *Milesburg I,* this court determined that due process required a hearing be held regarding approval of the original contract terms for a utility's purchase of power from a QF that included payments for capacity. We stated that while a full, trial-type of hearing was not required, "the commission must devise a procedure that provides the essential elements of a hearing, but allows for consideration of petitions of the type involved here in as expeditious and minimally burdensome a manner as possible.[17] *Id.,* 119 Pa.Commonwealth Ct. at 105, 546 A.2d at 1307. In *Armco Advanced Materials Corporation, et al v. Pennsylvania Public Utility Commission,* 135 Pa.Commonwealth Ct. 15, 579 A.2d 1337 (1990) (*Milesburg II* ), *reargument denied,* September 13, 1990, *petition for allowance of appeal granted,* 529 Pa. 624, 600 A.2d 539, 542, 543 (1991), which dealt with the remand order regarding the recalculation as of the date of a legally enforceable obligation, we further determined that a rehearing on the recalculations submitted by the parties was *not* required. Relying on our decision in *Milesburg II,* as well as on the fact that a hearing was never requested by either West Penn or the Industrials, we find that the PUC did not err by not holding an evidentiary hearing on the recalculations submitted in this case.

Regarding the issue of notice, West Penn's customers were not entitled to any notice of the recalculation of avoided cost because they never intervened in the original proceeding to

17. In *Milesburg I,* we also stated that the PUC should make its own calculations of avoided cost part of the record and should provide access of those calculations to interested parties prior to the "hearing." Under PURPA regulation 18 C.F.R. § 292.304(d)(2), the PUC has an absolute duty to determine whether the avoided cost component of the capacity cost agreed to by the utility and the QF is at or below the full avoided cost and is "just and reasonable" to the ratepayers. The PUC is obligated to fulfill this requirement by making its own calculation of the avoided cost on the record and comparing that figure to the contract rates. Although the PUC was required to make its own calculation of the maximum allowable avoided cost in this case as well, there is no indication in the record that the PUC did so. However, because no one raised that matter on appeal, that issue is not before us.

164

contest any of the terms of the EEPA. Had they done so, they would have been a party to the ongoing litigation. However, having been given notice and choosing not to intervene, they were not entitled to notice of the recalculations.

Consequently, because West Penn and the Industrials failed to comply with the PUC's order to submit recalculations of its avoided cost only using inputs known as of October 15, 1987, the PUC was within its authority to accept North Branch's recalculations as of that date so as to comply with our remand order issued in *Burgettstown I.* Accordingly, the decision of the PUC is affirmed.

## ORDER

AND NOW, this 15th day of July, 1993, the order of the Pennsylvania Public Utility Commission dated November 24, 1992, No. P–880284, is affirmed.